UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
                                            :

MARCO PUENTE,
                                            :

                 Plaintiff,                           OPINION AND ORDER

                                            :

            -against-
                                            :        14 Civ. 4427 (GWG)

COMMISSIONER OF SOCIAL SECURITY,
                                            :

             Defendant.
                                            :

--------------------------------------------------------------x

**GABRIEL W. GORENSTEIN, United States Magistrate Judge**

       Plaintiff Marco Puente brings this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security denying his claim for disability insurance benefits and supplemental security income under the Social Security Act. Puente has moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), and the Commissioner has cross-moved for judgment on the pleadings.[1] The parties consented to having this matter decided by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons stated below, the Commissioner's motion is granted, and Puente's motion is denied.

---

[1] See Motion for Judgment on the Pleadings, filed Feb. 4, 2015 (Docket # 14); Plaintiff's Memorandum of Law, filed Feb. 4, 2015 (Docket # 15) ("Pl. Mem."); Notice of Cross-Motion, filed Mar. 6, 2015 (Docket # 17); Memorandum in Support of the Commissioner's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Judgment on the Pleadings, filed Mar. 6, 2015 (Docket # 18) ("Comm'r Mem.").

I.       BACKGROUND

        A.       Puente's Claims for Benefits and Procedural History

        Puente filed applications for Social Security Disability benefits and for Supplemental

Security Income on September 27, 2011.  See Administrative Record, filed Nov. 26, 2014

(Docket # 10) ("R."), at R. 158-68.  In the applications, Puente alleged disability as of August

15, 2010.  R. 158, 160.  Puente was previously employed as a limousine driver, background

checker, and maintenance worker.  R. 191.  He stated that he stopped working in 2010 because

of pain.  R. 32.

        On December 16, 2011, the Social Security Administration ("SSA") denied both of

Puente's applications.  R. 71-78.  Puente then requested a hearing before an Administrative Law

Judge ("ALJ").  R. 79-83.  A hearing before an ALJ was held on February 4, 2013.  R. 26-46.

On February 22, 2013, the ALJ issued a decision finding that Puente was not disabled.  R. 9-22.

The Appeals Council denied Puente's request for review on April 18, 2014, making the ALJ's

determination the Commissioner's final decision.  R. 1-6.

        B.       The Administrative Record

        Puente and the Commissioner have each provided a summary of the medical evidence

contained in the administrative record.  See Pl. Mem. at 2-3; Comm'r Mem. at 4-9.  The Court

adopts the parties' summaries, which do not conflict in any material way, as accurate and

complete for purposes of the issues raised in this suit.  We discuss the portions of the medical

record pertinent to the adjudication of this case in section III below.

        C.       The Hearing Before the ALJ

        A hearing before ALJ Eric Borda was held on February 4, 2013.  R. 26-46.  The hearing

was held by video-teleconference, R. 28, and Puente was represented at the hearing by attorney

2

Douglas Brigandi, R. 26.  The ALJ heard testimony from Puente, R. 31-39, and vocational expert Christina Boardman, R. 39-46.

Puente testified that he completed high school and three years of college.  R. 31.  He was previously self-employed as a limousine driver.  R. 31-32.  He last worked as a limousine driver in 2010, but he had to stop because of pain in his back and cramps and pain in his legs.  R. 32.  The ALJ did not ask Puente about his other jobs as a background checker and maintenance worker because Puente's jobs as a limousine driver were "the only jobs at SGA [(substantial gainful activity)] level."  Id.  Puente has not worked since his alleged onset date of August 15, 2010.  R. 32-33.

The ALJ then asked Puente about his back problems and leg cramping.  R. 33.  Puente has chest pain, back pain, and cramping in his legs.  R. 33.  He gets chest pains "frequently," accompanied by shortness of breath.  Id.  He can get them at "[a]ny moment," day or night, even when resting.  Id.  Puente cannot stretch his back anymore because he feels like it is "cramping, like getting tighter and tighter."  Id.  He does therapy at St. Barnabas Hospital, but it only relieves his back cramping for a few hours.  Id.  Puente's legs are "constantly in pain from [his] waist down."  R. 34.  He "[s]ometimes . . . feel[s] like [he is] going to fall" because he "can't control [his] legs."  Id.

Puente testified that his diverticulosis causes him to "bleed sometimes."  R. 34-35.  He also suffers from hypertension, but it is well controlled with medication.  R. 35.  However, Puente complains that the hypertension causes fatigue and shortness of breath.  Id.  His medications include "Atenolol, aspirin, Pravastatin, Tramadol, and Ibuprofen."  Id.  The medications cause nausea and dizziness.  Id.

The ALJ asked Puente about a typical day for him.  R. 35-36.  Puente testified that he

3

"hardly go[es] out of the house." R. 36. He "[s]ometimes . . . watch[es] programs [and]

[s]ometimes [he] tr[ies] to do a little reading to try to not think about the problems that [he] has."

Id. Puente lives with his 28-year-old daughter. Id. When asked if he helps out around the

house, Puente replied that "the most [he] could do is the dishes sometimes." Id. Puente testified

that the most he can lift is 10 pounds. Id. He can walk for "[a]bout half a block" before he has

to stop. Id. He has to be "constantly moving and standing from sitting," and he can only sit for

a "few minutes." Id.

Puente was then questioned by his attorney. R. 37. Puente testified that he uses a cane

that was prescribed by a doctor on a daily basis. Id. As of the date of the hearing, Puente had

been using the cane for "two years and about three months." Id. On February 25, 2012, Puente

went to St. Barnabas Hospital for chest pain. Id. He has been to the emergency room of St.

Barnabas "[a]bout six times" in 2012, "[m]ostly [for] the pain in [his] chest and the pain in [his]

back." R. 38. When asked about his level of pain on a daily basis on a 10-point scale, Puente

replied, "In every other day I would say a nine at least, most of the time a 10, but when it gets a

little better it's like a nine." Id. When the pain is that severe, he goes to the hospital. Id.

Mr. Brigandi asked Puente about his responsibilities as a limousine driver. Id. His duties

included having to lift and carry "[a] lot of luggage[]," R. 38, which could weigh as much as 200

pounds each, R. 39. On any given day, Puente would have to work a "[m]inimum [of] 15

hours," and he spent almost the entirety of his day "behind the wheel in a car." Id.

Vocational expert Christina Boardman testified that she was familiar with jobs that exist

in both the region and the national economy. R. 40. She identified Puente's past work as a

limousine driver, otherwise known as a chauffeur, Dictionary of Occupational Titles ("DOT")

code 359.673-010. R. 41. She also testified that the "strength is light," and it had a specific

4

vocational preparation ("SVP") of 3.[2]  R. 42.

The ALJ asked the vocational expert whether Puente's past work, "as it was actually performed or as it's customarily performed per the DOT," could be performed by a hypothetical individual of Puente's age, education, and work experience, who can do light work, except that he could only occasionally climb ramps or stairs, he could never climb ladders, ropes, or scaffolds, and he could only occasionally stoop.  R. 42.  The vocational expert testified that such an individual could not.  Id.  The ALJ then asked whether there are other jobs in the national or regional economy that a hypothetical individual with the same vocational functions and limitations could perform.  Id.  The vocational expert testified that such an individual could perform the following jobs: mail clerk, DOT Code 209.687-026, which is a "light" strength position with an SVP of 2 and has 7,170 positions regionally and 150,010 positions nationally; routing clerk, DOT Code 222.687-022, which is a "light" strength position with an SVP of 2 and has 26,207 positions regionally and 60,087,908 positions nationally; and ticket taker, DOT Code 344.667-010, which is a "light" strength position with an SVP of 2 and has 5,750 positions regionally and 105,560 positions nationally.  R. 42-43.

The ALJ also asked the vocational expert about a second hypothetical individual that had the same limitations as the first hypothetical individual except that the individual is limited to

---

[2]  The DOT has been replaced by an online database called the Occupational Information Network or the O*NET.  See Dictionary of Occupational Titles Fourth Edition, Revised 1991, U.S. Dep't of Labor, http://www.oalj.dol.gov/libdot.htm.  The O*NET defines SVP as the "amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  O*NET OnLine Help, https://www.onetonline.org/help/online/svp.  The SVP "levels" correspond to time periods.  For example, Level 3 is a time period of "[o]ver 1 month up to and including 3 months," while Level 2 is "[a]nything beyond short demonstration up to and including 1 month."  Id.

sedentary work.  R. 44.  The ALJ asked whether jobs existed in the regional or national economy that such an individual could perform.  Id.  The vocational expert testified that such an individual could perform the following jobs: cuff holder, DOT code 685.687-014, which is a sedentary position with an SVP of 2 and has 6,900 positions regionally and 420,910 positions nationally; clerical addresser, DOT code 209.587-010, which is a sedentary position with an SVP of 2 and has 5,610 positions regionally and 96,330 positions nationally; and nut sorter, DOT code 521.687-086, which is a sedentary position with an SVP of 2 and has 7,630 positions regionally and 434,107 positions nationally.  R. 44-45.

Mr. Brigandi also questioned the vocational expert.  R. 45.  He asked whether the applicable medical vocational rules would direct a finding of "disabled" when applied to an individual who is 55 years old, has a high school education, has non-transferrable skills from work as a limousine driver, and is limited to sedentary work.  R. 45.  The vocational expert testified that they would.  Id.

     D.     The ALJ's Decision

On February 22, 2013, the ALJ issued a decision finding that Puente was not disabled from August 15, 2010 through the date of the decision.  R. 9-22.  The ALJ found that Puente had not engaged in substantial gainful activity since August 15, 2010, the alleged onset date of his disability.  R. 17.  The ALJ found that Puente had the following "severe" impairments: "history of a myocardial infarction [('MI')]; lumbar degenerative disc disease; and left knee and left hip degenerative joint disease."  Id.  The ALJ also found that Puente had the following "non-severe" impairments: "hypertension and diverticulosis."  Id.  The ALJ noted that Puente testified that his hypertension is controlled with medication, and as for his diverticulosis, Puente testified that he had not had any recent flare-ups, a concession that the ALJ found to be supported by the record.

Id.  The ALJ found that the evidence failed to show that Puente's hypertension and diverticulosis had a greater than slight or minimal effect on his ability to perform basic work activities, "and thus, these are non-severe impairments."  R. 17-18.

The ALJ then determined that none of Puente's impairments or combination of impairments "meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  R. 18.  Specifically, the ALJ determined that "[n]o treating or examining physician has mentioned findings that are the same or equivalent in severity to the criteria of any listed impairment, nor does the evidence show signs or findings that are the same or equivalent to those of any listed impairment."  Id.  The ALJ noted that he paid "particular attention to Listing Sections 1.02 (Major Dysfunction of a Joint), 1.04 (Disorders of the Spine) and 4.04 (Ischemic Heart Disease)."  R. 18.

Next, the ALJ found that Puente has the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except "that he can occasionally climb ramps or stairs and stoop; and can never climb ladders, ropes or scaffolds." Id.  The ALJ noted that Puente alleged disability as of August 15, 2010, based on "back problems, leg cramping and his chest," and that Puente claims to experience "terrible chest pain and shortness of breath."  Id.  He also noted that Puente had completed three years of college, has not had any flare-ups of diverticulosis, has controlled his blood pressure but still experiences fatigue and shortness of breath, lives with his 28-year-old daughter, and sometimes does the dishes.  R. 18.  He noted that Puente claims he cannot lift over ten pounds due to his back, has used a doctor-prescribed cane every day, went to the hospital in February 2012 for chest pain, and has been to the hospital about six times for chest and back pain.  R. 18-19.

The ALJ summarized the medical evidence of record on which he relied in making his

RFC determination, which included the following: Puente's self-reported descriptions of his daily activities, medical records from St. Barnabas Hospital, and a consultative examination by Dr. Robert Dickerson.  R. 19-20.

The ALJ then discussed the opinion evidence.  He gave "no significant weight" to a state agency medical consultant's opinion because "as a single decision maker that consultant is not an acceptable medical source within the meaning of 20 CFR 404.1513(c) and 20 C.F.R. 416.913(c) and is thus unable to establish or comment as to the existence of a medically determinable impairment or any related functional limitations."  R. 20 (emphasis omitted).  By contrast, the ALJ accorded "great weight" to Dr. Dickerson's "opinions regarding [Puente's] normal physical examination and only moderate exertional limitations" since the opinions are "supported by evidence showing intact hip, knee and lumbar ranges of motion, negative chest x-rays, consistently normal gaits and benign left knee and left hip x-rays."  Id.

The ALJ also determined that Puente was not credible because "the severity of his complaints were not supported by the medical evidence of record."  R. 19.  The ALJ noted that Puente's "lumbar MRIs document mild degenerative disc disease, while his hip and left knee x-rays show only some joint disease."  Id.  Puente's lower back, left knee, and left hip have "no evidence of fractures, subluxations or dislocations," and the record shows "no disc herniations, ligament sprains, joint tears or radicular signs."  R. 19-20.  The ALJ noted that the ranges of motion in Puente's hip, knee, and back were "normal" and that Puente's joints "have shown no signs of inflammation or tenderness."  R. 20.  The ALJ further noted that while Puente testified that he used "a doctor-prescribed cane for the past two years on a daily basis," Dr. Dickerson determined that it was not medically necessary nor did it improve his ambulation.  Id.  The ALJ found no mention of the cane in the records of Puente's emergency room visits, which describe

him as having a normal gait.  Id.  While Puente had been to the emergency room several times

for chest pain, the ALJ found that he does not have acute coronary syndrome, "he has not had

any recurrent myocardial infarctions and his last five chest x-rays have shown an essentially

normal heart with no signs of chronic heart failure."  Id.  The ALJ found "no evidence of heart-

related hospitalizations" and when Puente visited the emergency room with chest pain, he was

released within a few hours in stable condition.  Id.  The ALJ noted that Puente reported that he

can "care for his personal needs, clean, do his laundry, use public transportation, walk when

traveling outside and shop for groceries."  Id.

        Finally, the ALJ found that Puente's past relevant work as a limousine driver exceeds his

RFC because it is "too physically demanding," and therefore he is unable to perform his past

relevant work.  R. 20.  The ALJ accepted the opinion of the vocational expert that Puente could

perform the jobs of mail clerk, routing clerk, and ticket taker.  R. 21-22.  Based upon the

vocational expert's testimony, the ALJ concluded that "considering [Puente's] age, education,

work experience, and residual functional capacity, [he] is capable of making a successful

adjustment to other work that exists in significant numbers in the national economy."  R. 22.

Therefore, the ALJ found that Puente was not disabled.  Id.

II.     APPLICABLE LAW

        A.      Scope of Judicial Review Under 42 U.S.C. §§ 405(g) and 1383(c)

        A court reviewing a final decision by the Commissioner "is limited to determining

whether the [Commissioner's] conclusions were supported by substantial evidence in the record

and were based on a correct legal standard."  Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013)

(per curiam) (citation and quotation marks omitted); accord Burgess v. Astrue, 537 F.3d 117,

127 (2d Cir. 2008); see also 42 U.S.C. § 405(g) (2012) ("The findings of the Commissioner of

9

Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); id. § 1383(c)(3) ("The final determination of the Commissioner of Social Security . . . shall be subject to judicial review as provided in section 405(g) . . . ."). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); accord Burgess, 537 F.3d at 127-28; Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).

"Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (citation and internal quotation marks omitted); see McIntyre v. Colvin, 758 F.3d 146, 149 (2d Cir. 2014) ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.") (citation omitted). Thus, "[i]f the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists." Johnson v. Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990). The Second Circuit has characterized the "substantial evidence" standard as "a very deferential standard of review — even more so than the 'clearly erroneous' standard." Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 447-48 (2d Cir. 2012) (per curiam) (citation omitted). "The substantial evidence standard means once an ALJ finds facts, [a court] can reject those facts only if a reasonable factfinder would have to conclude otherwise." Id. at 448 (emphasis in original) (citation and internal quotation marks omitted). "The role of the reviewing court is therefore quite limited and substantial deference is to be afforded the

10

Commissioner's decision."  Johnson, 563 F. Supp. 2d at 454 (citation and internal quotation marks omitted).

B.       Standard Governing Evaluation of Disability Claims by the Agency

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); accord id. § 1382c(a)(3)(A).  A person will be found to be disabled only if it is determined that his "impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  Id. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To evaluate a claim of disability, the Commissioner is required to examine: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam) (citations omitted).

Regulations issued pursuant to the Social Security Act set forth a five-step process that the Commissioner must use in evaluating a disability claim.  See 20 C.F.R. §§ 404.1, 404.1520(a)(4) (2014); see also Burgess, 537 F.3d at 120 (describing the five-step process). First, the Commissioner must determine whether the claimant is currently engaged in any "substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(i).  Second, if the claimant is not engaged in substantial gainful activity, the Commissioner must decide if the claimant has a

11

"severe medically determinable physical or mental impairment," id. § 404.1520(a)(4)(ii), which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities," id. § 404.1520(c).  Third, if the claimant's impairment is severe and "meets or equals" one of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1, and "meets the duration requirement," the claimant must be found disabled.  Id. § 404.1520(a)(4)(iii).  Fourth, if the claimant's impairment does not meet or equal one of the listed impairments, or does not meet the duration requirement, the Commissioner must review the claimant's residual functional capacity to determine if the claimant is able to do the work he or she has done in the past, i.e., "past relevant work."  Id. § 404.1520(a)(4)(iv).  If the claimant is able to do such work, he or she is not disabled.  Id.  Finally, if the claimant is unable to perform past relevant work, the Commissioner must decide if the claimant's residual functional capacity, in addition to his or her age, education, and work experience, permit the claimant to do other work.  Id. § 404.1520(a)(4)(v).  If the claimant cannot perform other work, he or she will be deemed disabled.  Id.  The claimant bears the burden of proof on all of these steps except the final one — that is, proving that there is other work the claimant can perform.  See Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

III.    DISCUSSION

     Puente, through his attorney, challenges the ALJ's ruling on the following grounds: (1) the ALJ's RFC determination is unsupported by substantial evidence; (2) the ALJ erroneously concluded that Puente is not credible; and (3) the ALJ incorrectly determined that jobs that Puente can perform exist in significant numbers.  See Pl. Mem. at 1, 6-13.

12

A.      The ALJ's RFC Determination

Puente asserts that the ALJ's finding that Puente has the RFC to perform light work[3] except "that he can occasionally climb ramps or stairs and stoop; and can never climb ladders, ropes or scaffolds," R. 18, is not supported by substantial evidence, Pl. Mem. at 6-8. Specifically, Puente asserts that it is "unclear where the limitation of 'light work' originated." Id. at 7.

Puente first argues that the ALJ's reliance on Dr. Dickerson's medical source statement from the consultative examination was in error because Dr. Dickerson's opinion was "unduly vague" and "hardly . . . unambiguous." Id. Puente points to Dr. Dickerson's finding that Puente "'is moderately limited for exertion because of his history of MI'" and that Puente "'is unrestricted for any other activity on the basis of [the consultative] exam.'" Id. (quoting R. 251).

However, Dr. Dickerson's medical source statement, when read in the context of both the entirety of his consultative examination as well as the objective medical evidence in the record, was not "unduly vague."  Dr. Dickerson noted that Puente's chief complaints included MI, high blood pressure, hypercholesterolemia, lower back pain, and knee pain.  R. 248.  With respect to

---

[3] Light work, as defined by the applicable regulations, involves

lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b), 416.967(b).

Puente's MI, Dr. Dickerson noted that Puente "had an MI in 2003" and "spent nine days in Bellevue Hospital eight years ago" but that he had no revascularization and the "evidence for a completed MI is limited to the . . . hospitalization." Id. Dr. Dickerson noted that Puente did limited cleaning, laundry, and shopping because of pain, and that Puente dresses himself daily and needed no help changing for the exam or getting on and off the exam table. R. 249-50. Puente was not in acute distress, had "normal" gait, could walk on his heels and toes without difficulty, his stance was "normal," he could fully squat, and he could rise from a chair "without difficulty." Id. Dr. Dickerson noted that Puente "states" that he uses a cane for pain and balance, both indoors and outdoors, and that it was prescribed by his primary care doctor. R. 250. However, Dr. Dickerson described the cane as "not . . . medically necessary in so far as it does not improve ambulation exercises." Id. Examination of Puente's chest, lungs, heart, and abdomen were normal. Id. Dr. Dickerson noted "[r]egular rhythm" of the heart and no audible "murmur, gallop, or rub." Id. Dr. Dickerson also observed full range of motion of the cervical spine and the lumbar spine, as well as in the shoulders, elbows, forearms, wrists, hips, knees, and ankles. Id. Examination of the thoracic spine was normal, Puente's joints were stable and nontender, and there was no sensory deficit. R. 250-51. Dr. Dickerson noted that there was no muscle atrophy in Puente's extremities and his strength was "5/5 in the upper and lower extremities." R. 251. He also noted that Puente's "[h]and and finger dexterity [was] intact" and his "[g]rip strength [was] 5/5 bilaterally." Id.

Puente's argument is also unavailing because the ALJ did not rely solely on the medical source statement from Dr. Dickerson in determining Puente's RFC. Rather, as discussed extensively in the ALJ's decision, the ALJ also considered abundant medical evidence in the record, R. 18-20, and determined that Dr. Dickerson's opinion was supported by other "evidence

14

showing intact hip, knee and lumbar ranges of motion, negative chest x-rays, consistently normal gaits and benign left knee and left hip x-rays," R. 20.

With respect to Puente's chest pain, the ALJ noted that although Puente had a MI in 2005, he had no chest stents placed, no coronary artery bypass grafting, and no pacemaker. R. 19. On February 21, 2010, Puente visited St. Barnabas hospital complaining of chest pain. R. 265-66. However, as the ALJ noted, R. 19, he was stable, R. 272, his EKG showed no abnormalities, R. 273, his troponin was negative, id., acute coronary syndrome was ruled out, id., and he was released the same day in stable condition, R. 272-73. An X-ray that day showed a heart of "normal size," with no signs of congestive heart failure or acute infiltrates. R. 290. On November 11, 2010, Puente went to the St. Barnabas Hospital emergency room complaining of chest pain, R. 340, but an X-ray showed no cardiomegaly, no effusion, and no active heart disease, see R. 353-54. Puente was diagnosed with chest pain and released that same day. R. 343. Puente visited St. Barnabas Hospital again on January 15, 2011, for "internal bleeding." R. 357. An X-ray of his chest showed an essentially normal heart rate, with no signs of infiltrates or effusion. R. 389. Puente was released on January 17, 2011, in stable condition. R. 364. An X-ray on April 7, 2011, showed no evidence of infiltrates or effusion, no active disease and an uncoiled aortic arch. R. 409. Chest and heart examinations during a December 13, 2011 visit to the St. Barnabas Hospital emergency room were essentially normal, R. 439, and an X-ray showed no evidence of cardiomegaly and a slightly uncoiled aortic arch, R. 428-29. An X-ray on February 25, 2012, showed no evidence of infiltrates or effusion, no active disease, and a slightly uncoiled aortic arch. R. 431.

The ALJ also discussed Puente's musculoskeletal impairments. On May 9, 2011, Puente visited the St. Barnabas Hospital emergency room complaining of back and leg pain. R. 411.

Upon examination, Puente had a steady gait, no evidence of a limp, full sensation, and could walk on his heels and toes.  R. 412.  He had full muscle strength in his arms and legs, and normal reflexes.  Id.  He had no numbness, weakness, tingling, parasthesias, or calf pain.  Id.  He was discharged in stable condition.  R. 414.  A lumbar X-ray on July 12, 2011, showed no evidence of fracture or dislocation, and intact pedicles.  R. 427.  A lumbar MRI on February 27, 2012, showed mild disc bulges at L4-L5 and L5-S1, with no evidence of spinal stenosis, bone marrow edema, or spondylolisthesis.  R. 435.  Although Puente visited the St. Barnabas Hospital emergency room on December 13, 2011, and February 25, 2012, for a cough and chest pain respectively, the records indicate that Puente was ambulatory and had a normal gait.  R. 437, 439, 448, 450.  On February 25, 2012, he was noted to have 5/5 strength in his upper and lower extremities bilaterally.  R. 451.  An X-ray on July 11, 2011, showed degenerative joint disease in his left hip, R. 425-26, and an X-ray on November 22, 2011, of Puente's left knee showed no evidence of acute fracture, dislocation, or destructive bony lesion, but showed a "moderate-sized loose body in the suprapatellar pouch," R. 253.  The ALJ also noted that Puente underwent physical therapy in 2011 and 2012.  R. 19; see R. 261-62, 497-98.

In light of these medical findings, there is substantial evidence in the record to support the ALJ's conclusion that Puente retains the RFC to do light work with certain limitations as described by the ALJ.  This conclusion is further supported by Puente's own admitted activities of daily life.  In his October 29, 2011 Adult Function Report, Puente noted that he can do cleaning and laundry, R. 203, can use public transportation, id., can walk when traveling outside, id., is able to go out alone, R. 203-04, sometimes drives, R. 204, goes grocery shopping, id., and travels to therapy three times a week and church "once in a while," R. 205.  All of these support the conclusion that Evans is able to meet the exertional demands of light work with the

16

limitations described by the ALJ.

Puente contends nonetheless that "it was incumbent on the ALJ to re-contact [Dr. Dickerson] for clarification" because of the ambiguity that existed in Dr. Dickerson's opinion. Pl. Mem. at 8. The ALJ has an affirmative duty to develop the record in a disability benefits case. See Shaw, 221 F.3d at 131; accord Sims v. Apfel, 530 U.S. 103, 111 (2000) (ALJ has a "duty to investigate the facts and develop the arguments both for and against granting benefits") (citation omitted). Where the ALJ fails to develop the record, remand is appropriate. Rosa v. Callahan, 168 F.3d 72, 82-83 (2d Cir. 1999). Furthermore, the governing statute provides that the ALJ "shall make every reasonable effort to obtain from the individual's treating physician (or other treating health care provider) all medical evidence, including diagnostic tests, necessary in order to properly make" the disability determination. 42 U.S.C. § 423(d)(5)(B); accord 20 C.F.R. §§ 404.1512(d), 416.912(d). The ALJ's duty to develop the record remains the same regardless of whether the claimant is represented by counsel. Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999) (citing Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996)).

On the other hand, it is well established that "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." Rosa, 168 F.3d at 79 n.5 (citing Perez v. Chater, 77 F.3d 41, 48 (2d Cir. 1996) (holding that where the ALJ had "already . . . obtained and considered reports" from treating physicians, the ALJ "had before him a complete medical history, and the evidence received from the treating physicians was adequate for him to make a determination as to disability")). While there is case law suggesting that an ALJ has a duty to develop the record where there are "inconsistencies" in a treating physician's records, see Rosa, 168 F.3d at 79 (quoting Hartnett v. Apfel, 21 F. Supp.

17

2d 217, 221 (E.D.N.Y. 1998)); Calzada v. Astrue, 753 F. Supp. 2d 250, 278 (S.D.N.Y. 2010), we

read such cases "as requiring further development of the record only where the record was

incomplete," Brown v. Comm'r of Soc. Sec., 2014 WL 783565, at *17 (S.D.N.Y. Feb. 28, 2014);

accord Micheli v. Astrue, 501 F. App'x 26, 29 (2d Cir. 2012) ("The mere fact that medical

evidence is conflicting or internally inconsistent does not mean that an ALJ is required to

re-contact a treating physician."); Vanterpool v. Colvin, 2014 WL 1979925, at *16-17 (S.D.N.Y.

May 15, 2014) (ALJ had no responsibility to further develop the record even though where there

were discrepancies between the reports and contemporaneous records of the treating physician).

Here, there is no evidence that the ALJ did not possess a complete medical history when making

his RFC determination, and therefore Puente's argument that the ALJ was required to re-contact

Dr. Dickerson is rejected.

Finally, Puente argues that the ALJ "impermissibly 'plays doctor' and erroneously

substitutes his own lay opinion for that of a medical professional." Pl. Mem. at 7.  The cases

cited by Puente, id. at 7 n.7, however, are inapposite.  In Balsamo v. Chater, 142 F.3d 75 (2d Cir.

1998), the ALJ failed to "cite any medical opinion to dispute the treating physicians' conclusions

that [the claimant] could not perform sedentary work."  Id. at 81 (emphasis in original).  Here, by

contrast, the ALJ cited substantial medical evidence in the record to support his conclusion.  R.

19-20.  In Rugless v. Commissioner of Social Security, 548 F. App'x 698 (2d Cir. 2013), the

court merely stated that an ALJ "'cannot arbitrarily substitute his own judgment'" when

analyzing a treating physician's report.  Id. at 700 (quoting Rosa, 168 F.3d at 78-79).  Puente

points to no physician's opinion, or any contrary evidence at all for that matter, that is

inconsistent with or contradicts the ALJ's determination.  In Skrupien v. Colvin, 2014 WL

3533425 (W.D.N.Y. July 16, 2014), the court found that the consultative examiner's assessment

of "no restrictions" was inconsistent with the examiner's own findings of "lumbosacral spine straightening, decreased flexion of the lumbar spine, decreased sensation of the left lower extremity, and atrophy in the left calf." Id. at *5. Here, there is no such inconsistency.

       B.      Puente's Credibility

"It is the function of the [Commissioner], not [the reviewing court], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983) (citations omitted). Thus, the ALJ, "after weighing objective medical evidence, the claimant's demeanor, and other indicia of credibility . . . may decide to discredit the claimant's subjective estimation of the degree of impairment." Tejada, 167 F.3d at 776 (summarizing and citing with approval a holding in Pascariello v. Heckler, 621 F. Supp. 1032, 1036 (S.D.N.Y. 1985)). Nonetheless, when discounting a claimant's credibility regarding his RFC, regulations impose some burden on the ALJ to explain his decision. As the Second Circuit has stated:

> When determining a claimant's [residual functional capacity], the ALJ is required to take the claimant's reports of . . . limitations into account, 20 C.F.R. § 416.929; see McLaughlin v. Sec'y of Health, Educ. & Welfare, 612 F.2d 701, 704-05 (2d Cir. 1980), but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record. Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).

Genier, 606 F.3d at 49. To evaluate a claimant's assertion of a limitation, the ALJ must engage in a two-step process:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. 20 C.F.R. § 404.1529(b). . . . If the claimant does suffer from such an impairment, at the second step, the ALJ must consider "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" of record. Id. The ALJ must consider "[s]tatements [the claimant] or others make about [his] impairment(s), [his] restrictions,

[his] daily activities, [his] efforts to work, or any other relevant statements [he] make[s] to medical sources during the course of examination or treatment, or to [the agency] during interviews, on applications, in letters, and in testimony in [its] administrative proceedings."  20 C.F.R. § 404.1512(b)(3); see also 20 C.F.R. § 404.1529(a); S.S.R. 96–7p.

Id. (alterations in original).

The SSA has issued regulations relating to reports of pain or other symptoms affecting the ability to work by a claimant for disability benefits.  20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1).  These regulations provide, inter alia, that the SSA "will not reject [a claimant's] statements about the intensity and persistence of [his] pain or other symptoms or about the effect [his] symptoms have on [his] ability to work . . . solely because the available objective medical evidence does not substantiate [his] statements."  Id. §§ 404.1529(c)(2), 416.929(c)(2).  The regulations also provide that the SSA "will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [his] statements and the rest of the evidence."  Id. §§ 404.1529(c)(4), 416.929(c)(4).

Where an ALJ rejects witness testimony as not credible, the basis for the finding "must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record."  Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1988) (citing Carroll, 705 F.2d at 643); accord Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999).  The ALJ must make this determination "in light of medical findings and other evidence[] regarding the true extent of the pain alleged by the claimant."  Mimms v. Heckler, 750 F.2d 180, 186 (2d Cir. 1984) (citation and internal quotation marks omitted).  However, where an ALJ gives specific reasons for finding the claimant not credible, the ALJ's credibility determination "is generally entitled to deference on appeal."  Selian, 708 F.3d at 420 (citation omitted).  Thus, "[i]f the [Commissioner's] findings are supported by substantial evidence, the court must uphold the

20

ALJ's decision to discount a claimant's subjective complaints." Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984) (internal citations omitted); see also 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").

As to the first step, the ALJ determined that Puente suffers from medically determinable impairments that could reasonably be expected to cause his alleged symptoms. See R. 19. At the second step, the ALJ found Puente to be not "credible as the severity of his complaints were not supported by the medical evidence of record." Id.

Puente first contends that the ALJ's reliance on the October 29, 2011 Adult Function Report was in error and was "an inadequate basis for discrediting [Puente] because the ability to do laundry and use public transportation does not transfer to the ability to work 8-hours a day, 5 days a week, on a sustained basis." Pl. Mem. at 9 (citation omitted). The ALJ noted that Puente could perform some activities of daily living, since he "wrote in his October 29, 2011 Adult Function Report that he can care for his personal needs, clean, do his laundry, use public transportation, walk when traveling outside and shop for groceries." R. 20; see R. 202-04. However, Puente's argument misses the mark in that the ALJ's decision was not based solely on Puente's reported activities, but rather upon his consideration of a number of factors — including both Puente's testimony and the medical evidence on the record. See R. 18-20.

Next, Puente contends that "the ALJ failed to specify the reasons he was discrediting [Puente's] testimony as required by the regulations." Pl. Mem. at 10 (citing SSR 96-7p). Puente asserts that his testimony, if credited, "would have altered the RFC [determination] and would have likely directed a finding of disabled," and that "[a]lthough the ALJ lists some of [Puente's] testimony, he does not adequately discredit said testimony, nor does he bridge the gap that would

allow a subsequent reviewer to understand the reasons for the weight attributed [to] [Puente's] testimony." Id. The ALJ's decision, however, contained an extensive review of the record evidence, R. 18-20, and discussed in detail important pieces of that evidence in finding Puente not credible, R. 19-20.

Specifically, the ALJ found that MRI's of Puente's lumbar spine "document mild degenerative disc disease, while his hip and left knee x-rays show only some joint disease"; "his lower back, left knee and left hip have no evidence of fractures, subluxations or disclocations"; and the record "shows no disc herniations, ligament sprains, joint tears or radicular signs." R. 19-20. The ALJ noted that Puente's hip, knee and back ranges of motion were all "normal" and "his joints have shown no signs of inflammation or tenderness." R. 20. The ALJ also noted, id., that while Puente testified that he used a doctor-prescribed cane on a daily basis for the two years prior to the hearing, R. 37, Dr. Dickerson opined that it was not medically necessary and it did not improve his ambulation, R. 250. Further, the ALJ noted, R. 20, that Puente's use of a cane was never mentioned in any of the emergency room visits, which describe him as having a normal gait, see, e.g., R. 412 (noting Puente had a steady gait, could walk on his heels and toes, and had no limp); R. 450-51 (noting Puente had normal gait and full strength in his legs). The ALJ also found that while Puente visited the emergency room several times complaining of chest pain, "acute coronary syndrome has been ruled out, he has not had any recurrent myocardial infarctions and his last five chest x-rays have shown an essentially normal heart with no signs of chronic heart failure." R. 20; see R. 273, 290, 353-54, 409, 428-29, 431. The ALJ found no evidence of heart-related hospitalizations, and he noted that Puente was released in stable condition within a few hours following his visits to the emergency room for chest pain. R. 20; see R. 264, 272-74, 343, 402-03. Thus, we find that the ALJ adequately explained his decision

to discredit Puente's testimony.

Finally, Puente contends that his testimony at the hearing on February 4, 2013 — that he can, at most, wash dishes sometimes — "should have been considered by the ALJ because it was more recent information and would have thus been a more accurate up-to-date description of limitations." Pl. Mem. at 9. Puente also argues that the ALJ failed to evaluate his "attempts to obtain relief from symptoms," specifically the physical therapy he attended between 2011 and 2012 and therapeutic injections to his back that he received on July 25, 2012. Id. at 10-11. However, the ALJ's decision shows that the ALJ considered both the hearing testimony and his attendance at physical therapy. The ALJ specifically references Puente's hearing testimony and that Puente testified that "[a]round the house he does the dishes sometimes." R. 18-19. Further, the ALJ noted that Puente "underwent physical therapy in 2011 and 2012." R. 19.

Although the ALJ did not explicitly reference Puente's injections, as discussed above, the ALJ's decision contained an extensive review of the record evidence, which the ALJ found to be inconsistent with Puente's statements as to the severity of his complaints. See R. 19-20. Thus, we conclude that the ALJ properly considered the evidence that could potentially bear upon Puente's credibility. See, e.g., Brault, 683 F.3d at 448 (ALJ is not required to "discuss every piece of evidence submitted") (citation and internal quotation marks omitted); Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998) ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered."),

Because the ALJ's credibility determination with regard to Puente was not "clearly erroneous," this Court must accept his findings. Aponte, 728 F.2d at 591 (where an ALJ's findings are supported by substantial evidence, a court "must uphold the ALJ's decision to discount a claimant's subjective complaints of pain") (citation omitted).

23

C.      Jobs in the National Economy

Puente contends that the ALJ "erred at Step 5" of his disability determination by misapplying the medical vocational guidelines and because the ALJ's finding at this step was not supported by substantial evidence.  Pl. Mem. at 11-13.  At step five in the disability evaluation process, "the Commissioner must determine that significant numbers of jobs exist in the national economy that the claimant can perform," and an "ALJ may make this determination either by applying the Medical Vocational Guidelines or by adducing testimony of a vocational expert." McIntyre, 758 F.3d at 151 (citation omitted); see Rosa, 168 F.3d at 78 ("In the ordinary case, the Commissioner meets his burden at the fifth step by resorting to the applicable medical vocational guidelines (the grids).") (citations and internal quotation marks omitted).

First, Puente contends that because he "was just a couple of months shy from his 55th birthday at the date of the decision," the ALJ erred by mechanically applying the age criteria of the medical-vocational guidelines, Pl. Mem. at 11-12.  The SSA has issued regulations regarding the consideration of a claimant's age as a vocational factor.  The SSA

> will not apply the age categories mechanically in a borderline situation.  If [a claimant ] [is] within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that [the claimant] [is] disabled, [the SSA] will consider whether to use the older age category after evaluating the overall impact of all the factors of [the claimant's] case.

20 C.F.R. §§ 404.1563(b), 416.963(b); accord Grace v. Astrue, 2013 WL 4010271, at *24 (S.D.N.Y. July 31, 2013).  Puente was born on April 25, 1958, R. 186, and the ALJ issued his decision on February 22, 2013, R. 22, making Puente 54 years, 9 months, and 28 days old on the date of the decision.  Thus, the ALJ determined that Puente was in the "Person closely approaching advanced age" category, R. 20, which is defined as an individual between the ages

24

of 50-54, 20 C.F.R. §§ 404.1563(d), 416.963(d).  Puente argues that since he was "just a couple of months shy from his 55th birthday at the date of the [ALJ's] decision," the ALJ should have considered placing him in the "advanced age" category, Pl. Mem. at 12, which is defined as an individual that is "age 55 or older," 20 C.F.R. §§ 404.1563(e), 416.963(e).

This is not a case, however, where the guidelines would have mandated a finding of "disabled" given that Puente had the RFC for light work.  See 20 C.F.R. §§ 404.1569, 416.969. Here, the ALJ found that Puente was in the "individual closely approaching advanced age" category, R. 20; see 20 C.F.R. §§ 404.1563(d), 416.963(d), and that he has at least a high school education and is able to communicate in English, R. 21; see 20 C.F.R. §§ 404.1564(b); 416.964(b).  Given these factors, an individual capable of performing the full range of light work would be found to be not disabled under the medical-vocational guidelines, regardless of whether he had transferrable job skills.  See 20 C.F.R. Part 404, Subpart P, Appendix 2, Rules 202.14, 202.15.  The ALJ also determined that Puente was impeded by additional limitations, R. 21, referring to his finding that Puente is limited to occasionally climbing ramps or stairs and stooping, and that he can never climb ladders, ropes, or scaffolds, R. 18.  Thus, the ALJ properly did not rely on the guidelines but instead heard testimony from the vocational expert as to whether jobs existed in the national economy for an individual with Puente's age, education, work experience, and RFC.  R. 21-22; see R. 40-46.  Based on the testimony of the vocational expert, the ALJ found that, given all of these factors, there were a significant number of jobs in the national economy that Puente could perform.  R. 21-22.

Puente also asserts, Pl. Mem. at 12, that the ALJ's finding at this step was not supported by substantial evidence because although the ALJ found that Puente could perform light work at step five, R. 21-22, he also found at step four that Puente is unable to perform his past relevant

work as a limousine driver, DOT Code 359.673-010, which is also classified as "light" work, R. 20, and the ALJ failed to reconcile these two findings.  Although the ALJ found that Puente was capable of "light" work, he made that finding subject to additional restrictions — he found that Puente was limited to only occasional stooping and climbing of ramps or stairs and that he can never climb ladders, ropes, or scaffolds.  R. 18.  The ALJ also stated that Puente was precluded from returning to work as a limousine driver "because it is too physically demanding."  R. 20. Puente testified that he often had to carry luggage while he was a limousine driver, which could weigh as much as 200 pounds each, and that it required significant stooping.  R. 38-39, 213-14. The ALJ relied on the testimony of the vocational expert, who testified that a hypothetical individual of Puente's age, education, and work experience, who is limited to light work, and can only occasionally stoop and climb ramps or stairs and can never climb ladders, ropes, or scaffolds, could not perform Puente's prior work as a limousine driver but could perform the requirements of a mail clerk, routing clerk, and ticket taker, all of which are classified as "light" work under the DOT and all of which exist in significant numbers in the national economy.  R. 42-44.  Thus, the ALJ properly reconciled his finding that Puente was precluded from "light" work as a limousine driver yet remained capable of performing other "light" work.

IV.    CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings (Docket # 17) is granted, and Puente's motion for judgment on the pleadings (Docket # 14) is denied.  The Clerk is requested to enter judgment in favor of the Commissioner and to close this case.

SO ORDERED.

Dated: September 17, 2015
      New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

27